Abraham Kim
5500 Torrance Blvd
Torrance, CA 90503
310.756.3697
In Pro Per

FILED
2025 NOV 18 PM 4:10
~~CLERK US DISTRICT COURT~~
~~CENTRAL DIST. OF CALIF.~~
~~LOS ANGELES~~
BY_____ rsm

United States District Court
Central District of California.
~~SUPERIOR COURT OF CALIFORNIA~~
~~COUNTY OF LOS ANGELES~~

ABRAHAM KIM

    Plaintiff,

VS.

X (formerly known as Twitter)

    Defendant,

Case No.: **2:25-CV-11070-JAK-AJRx**

- CAUSE OF ACTION: GENERAL NEGLIGENCE
- DOCUMENTARY SUPPORT
- DECLARATION.

**Time For proceeding and determination.**

**E.D.Cal. 2022.** District courts have the discretion to defer questions of standing until AFTER CLASS CERTIFICATION, but may nonetheless opt, as a matter of case management, no address standing in advance of class certification– Miller v. Ford Motor Company

**E.D. Pa. 2002** Members of Nationwide class of insureds, who were universal life insurance policyholders alleging insurer breached its contracts with insureds when it increased cost of insurance rates, did not satisfy predominance requirements for class certification, even though every member of proposed CLASS certification, even though every member of proposed class

owned a policy with SIMILAR language; substance of insured claims' had changed, making it difficult to access the claim boundaries and exactly how insured BELIEVED insurer breached their contracts, insureds had not shown all or even most of their THEORIES could be PROVED on a classwide basis. Procedural objections to rate redetermination process, standing alone could not render class certification appropriate, and insureds had not shown any SMALLER class satisfied requirements for certification. Fed. R. Civ. P. 23(b)(3)---Id.

Members of the nationwide class of insureds, who were universal life insurance policyholders alleging insurer breached its contracts with insureds when it increased cost of insurance rates, failed to establish claims were cohesive and, thus, did not satisfy requirements to certify class to pursue injunctive relief: there were MANY theories (reddit/twitter) of breach which could not be litigated on a classwide basis, and even if classwide claims failed, another policyholder might successfully challenge insurer's rate increase on grounds that could not be raised in insured's action.

"[W]here there is no duty to defend, there cannot be a duty to indemnify." Certain Underwriters at Lloyd's of London v. Super. Ct., 24 Cal. 4th 945, 958, 103 Cal.Rptr.2d 672, 16 P.3d 94 (2001) (Powerine)

The complaint alleged that in 1934 appellant completed the production and thereafter exhibited generally throughout the United States a "talking motion picture" under the title "We're Not Dressing," which was based upon, and adapted from, the original story of plaintiff herein, entitled 'Cruise to Nowhere'. This [accounting] sheet contained the following: Production No. 983 / Title 'We're Not Dressing' / "From Story 'Cruise to Nowhere'. The objection was "upon the ground that no proper FOUNDATION is laid to show that anyone CONNECTED with the accounting or

auditing apartment, or that DEPARTMENT ITSELF, had anything to do with selecting either the title for a given picture, or determining whether a given picture sho;d be based upon or adapted from a given story or not. [An original story with 2 interpretations or screen adoptions].

The United States also contends, though not pressing it with vigor, that by the Treaty of Guadalupe Hidalgo there was a withdrawal of the swamp and overflowed lands in question because of the pendency of the invalid Castro Claim. Such a withdrawal would remove the claimed aea from the "public lands" category, and hence it would not pass to California by virtue of the grant of 1850.

We hold there was no such withdrawal… The patents to CALIFORNIA determine the satisfaction by the patentee of the requirements of the granting act of 1850 as to identifying the land by surveys as swamp and overflowed land, of which the United States conveyed WHATEVER TITLE IT HAD IN 1850… We take it that the United States is not seeking to cancel the patents because of a mere failure of the Secretary in some ministerial duty regarding the approval one or another survey in his files.

Survey No. 34, upon which the descriptions in the patent are based. His return shows the exercise of that discretion on January 10, 1925, in the following language: "From the evidence before me I am led to the conclusion that the body or strip of land known as Survey No. 34, was, at the date of the swamp-land GRANT of September 28, 1850, swamp in character.

The patent reverts back to the date of the grant of 1850, and conveys as of that date, whatever legal title it then had, thus completing in law whatever had been granted in equity. French v. Fyan, 93 U.S. 169, 170, 23 L.Ed.812

## II. THE HEAVY BURDEN OF PROOF ON THE UNITED STATES IN SEEKING TO CANCEL ITS PAENTS.

As stated, the patent, until overcome by such evidence, establishes the fee to the land in the appellands. As later shown, it also establishes the states of California as the cestui que trust of the United States, holding the full equitable virtue of the congressional grant of 1850; the United States, as trustee, holding the bare legal title. This is the given quantity, to displace which this heavy burden rests on the United States.

We will now consider the claim of the United States that it is shown the validity of the Castro title by evidence in the instant case.

III. Assuming that the Castro title could be established against the patents by new evidence in the instant case, commenced more than 65 years after the exiration od the time to file claims before the Land Board, its validity is not sustained here, because: (a) The paper writing purporting to be a certified copy of a writing in Spanish, in words of a Mexican grant to CASTRO, recorced in a county other than that of the location of the land, with no showing of execution of an original, and without acknowledgement, is not admissible under the California law, EVEN THOUGH UNSUCCESSFUL SEARCH FOR AN ORIGINAL HAS BEEN PROVED. (b) Even if the execution of some grant to Castro had been shown and the alleged copy offered in the course of proving the contents of an ancient document, it was not admissible because no proper search for the original was made. Herein of the decision in the Bouldin v. Phelps case ([C.C.] 30 F. 547) that the Castro grant was fraudulent and void certain ethical considerations relative to the conduct of the United States here seeking equity. (d) There is no evidence of even a possessory right in or possession by Castro.

Underlying all the government's attacks on the patterns to California. It's claim that Castro in 1841 granted the Swamp and overflow land by the Mexican government. The brief of the United States concedes "that the landing controversy were swamp and overflow and physical character and would have been swamped and overflow land under the active September 28, 1850, if they were public lands of the United States at that date.

In this proceeding, the pattern established the status of California and its successor and interest of California and its successor and interest as present owners of the legal title. They further establish that California was granted, in praesenti, in 1850, full equitable interest by congressional active that year, the United States reserving the paralegal title. This status established by the given quantity and the legal problem here involved. To overcome it, the government has upon the extraordinary burden, approved to defeat the title on the righteous established by such a solemn instrument.

On November 6, of 1850, President Fillmore attempted to reserve Mare Island, including the swamp from overflow lands and in 1853 he made an attempt to make these lands "a reservation of public lands" authorized under the active Congress of August 31, 1852 (section 3 [10 Stat. 104]). We hold out, because of the prayer to the state, neither the reservation was affected, diverse California than full equitable interest in the dispute. On March 3, 1851 (9 Stats. 631, c. 41), congress created a commission of three commissioners for the purpose of ascertaining and settling private land claims in the state of California section one. This app provided anyone claiming to the land of California derived from a Spanish or Mexican grant most within the two years present, his claim to the commission must render a decision on the validity of the claim. Section 9, provided for a court review of such decision by the District Court, and section 10 provided for an appeal to the Supreme Court. Respect to all land, the claims which were not presented to the commission within the two year period. Such lands were considered as part of the public domain. *Section 15* provided that the

final decrease rendered, or any patents issued, under the act shall be conclusive *between the United States and the said claimants, only and shall not affect the interest of third persons*" (Italics supplied)

On October 10, 1854, and after it had acquired whatever title Castro had, the United States, for the first time appeared in the land commission proceeding and the taking of a deposition. Without advising the commission of its personal proprietary interest in Castro title, it proceeded to conduct a pretend controversy with Bissell and Aspinwall

To the purpose of reclaiming, sad lands by means of the leaves and drains of forehead, "Sec. 3. And be it further enacted, that in making out a list and plates of the land of force, all equal subdivisions, the greater part of which is wet and unfit for cultivation, Shelby included, and said list and Platt, but when the greater part of a subdivision is not of a character, the whole of it shall be excluded there from. "Sec.4 and be further active, that the provisions of this act be extended, too, and their benefits be conferred upon, each of the other states of the union in which each swamp and overflow land, known as a designated as a force set, may be situated." (Italics supplied.) 9 Stat. 519.

The United States contains that the California was not a "third person" alien to this controversy within the meaning of the statue creating the commission, but contends that California, and the appellants here are *remote claimants under, successors to, and two in privity with, the United States of America*, enhance the decree and favor of the cash of title is a decree also against California and a penance, and "*they are bound by said decree*". This, although at all times after its appearance, it was the proprietary interest of the United States to establish at the Mexican government, granted the lands in controversy to Castro, and therefore they were not seated to the United States by the treaty of Guadalupe Hidalgo.

On March 18, 1857, about a Ford after a date of the unsigned decree, the state of California gave to one David Darlington. It's patent to the mayor Island swamp and overflow lands, identified as those in survey number. 34, the lands in dispute. And the present suit the United States seeks also the cancellation of the Darlington patent from California, and of all intervening conveys to and including those two appellants.

On April 15, 1930, in the district court, the case of the U.S. versus Bissell and Aspenwell was reopened, and a decree nunc pro tunc of March 2, 1857, was ordered in favor of Bissell and Aspenwall. The decree recites both the acquisition of the title by the United States that the order directing a decree establishing the *Castro* title was by consent of the United States District Attorney.

Neither the state of California, then holding the United States patent, nor any have been permitted to argue the question of its liability under the terms of the contract of insurance; but it cannot be permitted to raise the question of collusion in the obtaining of the state court judgment.

On February 19, 1934, I did not have any other business other than that of a housewife. The appellant, however, argues that both the place of the accident and the nature of the service was performing at the time of the accident refused a contention that she was performing a household domestic service. It was pointed out. The place of the accident was four or 5 miles from the household of the Brinkman's and it is contended that a nature of service pertaining more to a trucking or parcel delivery was not even remotely translatable into a household domestic service. We do not concur, however, the app appears to assume that the household service must necessarily be performed on the premises occupied by the household. It is the nature of the task, not the place of the performance, that determines the character. The appellee was returning some tubs that she had to use in doing some laundry for work for her employer. In other words, she was doing work

incidental to the completion of a household chore. May denial, however, based on lack of information or belief, that a trial was had on a merits, is not an equivalent to the requisite, affirmative allegation of collision or fraud. There might be other reasons why trial was not had on the merits, besides the reasons based on a collision or a fraud. Aside from all this, however, there is an additional reason why the appeal cannot set up a defense for the collusion.

(B) for bodily injuries or death suffered by any employees of the assured, while engaged in the operation, maintenance or repair or any disclosed motor vehicle or injured in the course of employment in the business of the assured, or to any person to whom they assured may be held liable under the Workmen's Compensation law. This is fucking useless.

This interpretation is in harmony with the intent of the policy that can also be inferred from the fact that the paragraph where the purposes of which insured automobiles may be used for family use is specifically classed as pleasure.

And Kaifer v. Georgia Casualty Co., 67 F. (2d) 309, which is set forth and not to that opinion, at page is 309, 310. That case, we constructed a similar policy, provision, and hell that although the injured person was an employee of the Columbia pictures, corporation, then named assured of to whom the policy has been issued, he could recover from the insurance company under the policy, although he was injured under another employee of the Columbia pictures corporation, who is an additional assured covered by the terms of the policy. And holding said: if it be held that he was engaged in the business or occupation of the name, assured Columbia, he certainly was not either an employer or engaged in the business of additional assured (Sparks). We concur this contention. If the defendant had desired to include the liability for any injury to any employee of Columbia, caused by a fellow employee of Columbia, such exclusion would have been clearly expressed in the

policy. Any ambiguity must be resolved against ensure. In our judgment, however, there is no ambiguity in the clause; it does not cover the present situation, if they're being an unintentional omission, we are powerless to supply the needed words. A 'housewife' is not engaged in a business. Within meaning of the term used in the policy or the term 'employee' is using in section 6 to 31 inclusive of this action shall be construed to mean: Every person the service of an employer, but excluding any person who is employment as both casual, and not in the course of the trade, business, professional, or occupation of his employer, and also including Any employee engaged in household domestic service. The term 'casual' as used in this section shall be taken to referral only to employment where the work contemplated is to be completed not exceeding 10 working days without regard to the number of men employed, and where the total labor cost of such work is less than $100. Deering's Codes and General Laws of California, 1933 Supp., Act 4749, § California 8, pp. 1831, 1832.

Suppose a fire caused by lightning burns 500 acres of a plaintiffs ripe grain; suppose on the same day, our neighbors tortoise starts a bush fire which burns towards a lightning fire and joins the lightning fire after 500 segregable acres have burned. The bush fire on the lining fire continued together through the plaintiff grain and burn 100 acres more.

Is the tortoise neighbor liable for 100 acres or for 600 acres? Is it obvious that he is liable only for the hundred acres? The case is not distinguishable because the act of nature and ones work through water and in the other through fire. A careful search fails to disclose any case, holding that a tort-Fraser is liable for damage, not inflicted by him because a force disconnected from the Torah, which caused such prior damage, merges with the torque, and both inflict further damage.

And the shipper's liable proceeding under the hardware, evidence established that the data equipment on vessel were incorrect as the changes in the life ship and the boy near scene of stranding, and that the navigation in reliance upon such data and equipment, resulted in stranding and authorizing shipper's recovery (Harter Act, § 3, 46 U.S.C.A. § 192). . . . . . . . *Shipping*... any of the experience members of the Admiralty borrowed took apart in the case on either side ventured to suggest that the vessels, equipment of charts and like data had no bearing upon her sea worthiness. On the contrary, everyone seemed to assume, as a court held, that the ship owner was bound to supply the vessel with navigational equipment with an ordinarily, intelligent and careful *mariner* might safely navigate it. Search documents, of course, become sources of information for the navigator, and the task of securing them is often delegated to officers of the ship. Failure to supply adequate information or navigation, without it may constitute negligent, navigation or management, for which they are chargeable; but it does not follow that the owner is thereby relieved by the harder rack from the liability from ensuring disaster, because the same circumstances may also amount to a failure on his part due to due diligence to make his vessel seaworthy.

Interested in a suit in Italy, brought by all of bills of lading and receivers of cargo in Italian parts for the purpose of recovering deposits of money exacted from them by the master of the ship under a claim of general average, the court made similar findings, a fact, with reference to the faulty, nautical charts of the ship, and the alleged change in the contemplated course of the ship on her way to Galveston into Wilmington and the cause of the stranding, as appears from a decision from the First part of the Court of Appeal of the Trieste rendered from June 22, from 1936. Affirmed. . . . The Maria by the ocean and the river.

Internal revenue 47(5): insufficient to sustain convictions for possessing counterfeited strip stamps for the kind prescribed for use and the fixing two and and pasting over mouths of bottles and bottling of distilled spirits and bond for selling stamps and for selling use liquor bottles for reuse and sale of distilled spirits (26 U.S.C.A. §§ stamps 1222, 1282).

You're a bill of lading containing a general average clause, which has since been known as the Jason clause, which has been made both ship owner and cargo owners liable for a contribution to General average in case of the ship on ride exercise due diligence to make the ship, see where the improperly demand, equipped, and supplied. These questions were (1) whether the ship owner was entitled to the general average contribution from the car owners by reason of expenses, made for the *salvage* of the vessel in the cargo, and (2) whether the cargo owners were entitled to such contribution from the ship owner on the ground that the stranding was caught, sold you by the competence of the master, the defective condition of the ships compasses, and the faulty negligent navigation. . . . If the ship's compass is in the faulty negligent navigation where the issue of the ship seaworthiness than the word and the alternator would not be able to apply any pressure. That the master was incompetent or that the compasses were defective or that the ship herself was unseaworthy, but he found that the master guilty of negligent navigation. The District Judge, being the opinion that the Jason clause was invalid under the interpretation placed upon the Harter Act in The Irrawaddy, 171 U.S. 187, 18 S.Ct. 831, 43 L. The vessel was equipped with the chart, bearing of caution as to its reliability, that showed the show about 4 miles nearer to the chart of course, and the position indicated by a better chart which I've been published a few months before the accident, but had not been supplied to the ship. A comparison, of course, is steered by a ship on leaving Port. A previous occasion showed a variation of method method irreconcilable with Duke care. Moreover, the evidence showed that, if a proper lookout had been maintained, signs of danger would have been discovered in time to have the void of the disaster. No one seems to have made the point that the

ship herself was unseaworthy because she was not equipped with the proper chart, the statement of affect leaves it uncertain whether the latest available chart was entirely reliable. The fact remains that none of the courts discussed the faulty relationship of the charts and sailing data to the sea worthiness of the ship. The Supreme Court indeed had no occasion to consider the question because their recital affects certified to contain the statement that the ship was seaworthy. Having reached the conclusion based on these facts that the stranding was a result of bad semen ship the court dismissed the label of the ship owner, whether the failure to supply the ship with the best chart available, indicated a lack of care in the part of the owner to render her seaworthy. The letter however, was held not entitled to an affirmative recovery of the balance. This circuit court of appeals affirm the dismissal of both libels, holding us to the ship owner that the Jason clause was invalid and conferred no right upon them to share in the contribution for general average, and asked the cargo owners. They cannot bring the ship owner as a contributing interest into a general average adjustment which may result in a claim that the Harter Act disallowed. The circuit court of appeals, however, certified the legal questions evolved in the Supreme Court, accompanied by the statement of the fact that the ship was seen where the improperly man, equipped and supplied, and that the stranding was due to negligent navigation.

Changes in the channel of which do you notice have been published by the United States hydrographic office; the court held the vessel liable for damages to the cargo of the accompanying barge. Limited liability… Limitation of liability was an opinion of the evidence… The court thought that, although it was shown that the master did not have the knowledge which might have enabled him to avoid the danger, the managing officers of the owner. We're not shown to be aware of this condition, and that it would be set up to exacting a standard of proper equipment to hold that the owner failed to furnish a properly equipped tug because the master was not furnished prior to each voyage with all available sources of information in regard to the impeding dangers of navigation.

The harder act not being applicable to the tug... who is guiding the tug? The decision was affirm, but the court accepting the decision of the District Court that the tug was at fault, made no mention of limitation of liability and confined its discussion to showing that the third section of the heart act does not exempt a tug owner from liability or loss from the cargo of a barge through negligent coverage.

The Jason and Murle cases have not been generally accepted as establishing the role contained for is indicated by the decision in the case of the steel scientist, reported as Daisy Philippine underwear Co. v. United States Steel Products Co v. American & Foreign Insurance Co. The vessel was stranded in a voyage around the world because the charts on the board had not been corrected to show a certain *light* which was established after a visit of the vessel, the same locality on the previous voyage. The means for correcting the chart, however, we're a board in the shape of navigational supplements and documents, which showed the change. Cargo was lost or damaged in general average expenses were incurred as a result of the stranding. Libels were brought by shippers against the ship owner to recover for loss or damage to cargo and the ship owner file the liable to recover contributions in general average alleged to be due from the cargo.

Ranch office is of the United States hydrographic office in New Orleans and Galveston, and the office of the United States coast and Geo did a survey in New Orleans, and all of which corrected charts, lightless, pilot books, daily memo, and notices were available for examination by all mariners, domestic and foreign. Both the hydrographic office and the coast in the Geodetic survey had agents in New Orleans and Galveston for the sale of their respective publications.

Conclusion was reaching the trial on the dish corner of the southern district of New York of certain suits growing out of the same accident brought by a sign of consignee of the car, goes to the vessel,

who upon our arrival at the Trieste or required to make deposits to secure delivery of cargo, free and clear of a lien for general average assorted by the ship owner. See the Maria (D.C.) 15 F. Supp. 745, 751.

The facts are that the motor ship of vessel engage in the common carriage of merchandise cell from New Orleans on May 20, 1932, with the cargo which included 1093 pieces of lumber for carriage to Trapani Italy, under two bills of lading issued to standard export number company Inc. the Pelly. On March 15, 1932 she sailed from Trieste upon an itinerary which included Mobile, New Orleans, Houston, and Galveston, and then back to the Mediterranean port. Before leaving Galveston, the master was instructed by the owner through its local agents to proceed to Wilmington, N. C. For an additional cargo neither or master nor any of her officers have ever sold before to Wilmington. On June 12, 1932 an early forenoon, under favorable weather conditions, she was stranded on Frying Pan Shoals off the mouth of the Cape River Fear deck, and all of it, together with other cargo, was jettisoned to lighten the ship. Repairs were affected in Newport News and she resumed her voyage, proceeding first to Wilmington and advancing to the Adriatic as originally intended. *Issue is whether the vessel was seaworthy for a voyage to Wilmington, whether she left the golf ports.* Someone useless fuck messed up right here... the label it contented that she was on seaworthy for his voyage because of the failure to provide her with sailing charts or other navigational equipment correctly, setting out that the change position of a light ship and a boy of the southeastern limit of the Shoals known as a Frying Pan Shoals Light Ship, and the Frying Pan Shoals Gas Buoy 2 AFP, this buoy had been moved prior to the location of *Light Shift*. Buoy 2FP was located about 10 miles north west of the *first location* of a light shift. The ship owner on the other hand contended that even if the Bessel correct chart and similar data, the failure was merely the fault of the master to keep himself properly informed us to the exigencies of navigation to be met in the course of the constipated voyage and did not constitute worthiness on the part of the ship herself. In response to master

produced certain charts issued by the United States coast and Geodetic survey in the United States hydrographic office, light list for the Atlantic coast issued in 1930 by the Department of commerce of the United States, the United States Coast pilot book, section D, and the British light list. The status showed the position of the light ship and buoy 2 AFP as they were located prior to July 16, 1930, and also showed buoy 2 FP as an unlighted Buoy. She was in fact navigated in reliance upon the faulty charts and navigational data which the master produced when his deposition was taken, and that, as a result, the stranding took place. . .

. . . with regard to the dangers of navigation which she may expect to encounter on a prospective voyage, is pertinent to the navigation of the SHIP(s) and Sailor(s). . . . the only question at issue was whether the vessel was seaworthy for a voyage to Wilmington from the Gulf Port(s). . . A libel in rem was filed by the shipper to recover the value of the lumbar and the defense was the she was not liable for the loss under section 3 of the Harter Act, 46 U.S.C.A. § 192, since it was due to a fault in navigation or in management, and the owner had exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied. All charts on board the vessel when she was stranded covering the waters between the Gulf of Mexico and Wilmington, and also all lists, pilot books, and sailing directions on board covering the vicinity of Frying Pan Shoals and the approaches of Wilmington. This subpoena obviously called for the production of all navigational data and equipment aboard the Maria. And Master produced charts, certain charts issued by the United States Coast and Geodetic Survey and the United States Hydrographic Office, a light list for the Atlantic Coast issued in 1930 by the Department of Commerce of the United States, the United States Coast Pilot Book, Section D, and the British Light List. . . This data showed the position of the lightship and buoy 2 AFP as they were located prior to July 16, 1930, and also showed buoy 2 FP as an *unlightd* buoy.

In Equity the difference between the contentions of the United States in the Throckmorton Case and in the case at bar has a profound legal as well as ethical significance. In the former it sought relief against

an outstanding title, which would have been given if its agent in the Land Board had been interested in the Mexican claim. Here it asserts the Board's action adjudicated to the Mexican title in which, not merely it had an interest, but which, previously and unknown to the Land Board, it had purposefully to aid it in holding its Mare Island against the claim of its cestui.

. . . Inter Alia, Gold Dust Company and the American Linseed Company . . .

The consolidation of merger between the two companies to be found to be void in so far as it affects the appellant. However, the court is not required to measure the industry and effectiveness of the performance of the Government's Statutory Duty and obligation to California to resist the "Castro" claim. Once the Government requires interest adverse to California's proceeding can take no advantage from commission. In the case of Michoud v. Girod. Trustee cannot legally purchase on his account thatnn which he sell upon his own account; Person's holding confidential relations to each other that the cestui que trust may avoid the transaction, even though sale was fraud. Section 25 of the *Land Commission* ACT says, any patent to be issued under this act shall be conclusive between the United States and the said claimants only, and shall not affect the interests of the thor person . . . Target / Starbucks / Exxon Mobile / State Farm . . .

With regard to the conviction of the alien defendant, it is readily seen that Section 9(a) of th California Alien Land Law place the burden of disproving ineligibility or alienage upon the defendant. He must prove either that he is not an alien or that he has been, or is eligible to be, naturalized and this established his innocence. This is appropriately termed the "rule of convenience". there is no negative allegation that we require the ALIEN to disprove. We state that no alien can own agricultural land. Then we attempt to require the Alien to DISAPPROVE. Then we attempt to require the alleged alien to prove that he is not an alien or that he has been naturalized. *Thus it is pertinent to inquired whether or not a rational connection between the fact proved and the fact presumed is an essential element.*

## EAT YOUR VEGETABLES AND BE SUED FOR PATENT INFRINGEMENT

1. method of exercising a cat comprising the steps of: initial pattern of light an landing pattern of flight.
2. Method of Claim 1; wherein said apparatus produces a beam of coherent red light.
3. Method of Claim 1; wherein said bright pattern of light is small in the area relative to the paw of the cat.
4. Method of Claim 1: wherein said beam remains invisible between said laser and said opaque surface until impinging on said opaque surface.
5. Method of Claim 1: wherein step (b) includes sweeping and said beam at an angular speed to cause said pattern to move along said opaque surface at a speed in the range of five to twenty-five feet per second.

The examiner mailed a first Office Action on August 22, 1994, rejecting all five claims for obviousness. In rejecting the claims, the examiner cited a publication by Caravan et al. involving the use of light for stimulation of reflexive movements in [CATS].

The claims provide for an "eye means" on the umbrella handle, which receives an identification "member". This member may also attach to a key ring. When the umbrella is left at the location, the member is detached from the umbrella and attached to a key ring. Upon looking at one's key's one may easily determine that the umbrella was left behind and backtrack to retrieve it. *DEPENDENT* claims regarding the design on the identification clip are also present in the patent.

(Combination umbrella) U.S. Patent No. 4,586,584 / Swiss Patent 584,016

Lastly, Section thirty-four provides that any stage of the proceedings for condemning lands foe railroad uses, the Court or Judge may enter an order authorizing the railroad company if already inoosession of the land sought to be condemned, to continue in the use and occupation; "and if not in possession to take possession of and use such premises during the pendency, and until the final conclusion of such proceedingsm and may stay all actions and proceedings against such company shall pay a sufficient sum into court, or ive security, to be approve by the Court or Judge, to pay the "compensation" reffered to in which the land shall be finally taken for public use . . .. .. . . . .. . . . . . . .

In Fox v. Western Pacific Railroad Company, Mr. Justice Sanderson says: "Under this view, the only objection which can be urged against this statute is, that it may possibly be made to justify a trespass, in the event the corporation should finally conclude not to take the land. But the answer to this possibility does not exist; for the moment the time has passed for making the compensation, or the moment the corporation elects to take the land, the shield interposed between it and the individual pending the proceedings on the score of trespass is withdrawn. . . That happens everyday, in every conceivable case, and it is beyond the power of constitutions and status to prevent it.

However, it is limited to the family home and applies only at dissolution…

Dated 24th of June, 2025.

_____
Abraham Kim
In Pro Per

PLD-PI-001(2)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

## CAUSE OF ACTION—General Negligence     Page _____

_____ (number)

ATTACHMENT TO  ☑ Complaint   ☐ Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

GN-1. Plaintiff *(name)*: Abraham Kim

alleges that defendant *(name)*: X (known as twitter)

☑ Does   Online Blocking  to  Plantiff
Cooperative Aiding

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant negligently caused the damage to plaintiff

on *(date)*: Jun 8

at *(place)*: 17119 Stark Ave, Cerritos, CA 90703

*(description of reasons for liability)*:

A. Conspiracy

18 U.S.C. §371 Conspiracy to Commit offense or Defraud the United States

1. An agreement b/w 2 or More people
2. An Overt Act by one of the Conspirators.

18 U.S.C. §2: Aiding & Abbetting

18 U.S.C. §875(b) & (d) / 49 U.S.C. §46507(2) False Information.

My Account got Suspended for posting stuff on twitter and replying to the News and Fbi for ice Deportations...

apparently theres an Outage on X according to KTLA and the Court clerk keeps saying the internet is down. Maybe its a gay thing...

Former ICE Director Thomas "If you want to seek asylum you go through the port of entry, You do it the legal way."

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(2) [Rev. January 1, 2007]

**CAUSE OF ACTION—General Negligence**

Code of Civil Procedure 425.12
www.courts.ca.gov

For your protection and privacy, please press the Clear This Form button after you have printed the form.   [Print this form] [Save this form]   [Clear this form]